JOURNAL ENTRY and OPINION
{¶ 1} Appellant Dan Day appeals from his convictions for murder and reckless homicide following a jury trial. He complains that the court erred by denying his motion to suppress a statement he gave to the police, and denied him a fair trial by allowing the state to both read the statement to the jury and admit the written statement into evidence. He also contends that the court erred by refusing his request for appointment of a medical expert to assist the defense. Appellant argues he was denied due process when the court allowed prejudicial and inflammatory testimony to be introduced about the relationship between him and the victim, and when the prosecutor expressed his personal opinion about the appellant's guilt. He asserts the court erroneously overruled his motion for acquittal, erroneously instructed the jury, and erroneously sentenced him for murder rather than reckless homicide. Finally, he argues that the murder statute under which he was convicted violated his rights to equal protection and due process. We find no error in the proceedings below, and therefore affirm appellant's conviction and sentence.
 Procedural and Factual History {¶ 2} In an indictment filed December 18, 2002, appellant was charged with two counts of murder in connection with the death of Beverly Atterberry. Count one charged that appellant purposely caused Atterberry's death; count two charged that he caused her death as a proximate cause of committing an offense of violence that is a first or second degree felony. Appellant moved the court to appoint a medical expert to assist the defense in evaluating the autopsy, and moved the court to suppress a statement he made to the police. The court held a suppression hearing immediately before trial.
 {¶ 3} At the suppression hearing, Patrol Officer Wanda Babb testified that she was assigned to the report desk at Cleveland Police Headquarters on December 7, 2002. At approximately 12:00 noon, a man (later identified as the appellant) and woman (later identified as appellant's sister) approached her desk. The man reported that he and his wife had been fighting for the past three days and that "he had beat her up pretty bad," but she had been "okay" and went to bed. He found her dead when he went to check on her in the middle of the night. The officer-in-charge at the Fourth District police station confirmed that there had been a death at appellant's home, and asked Officer Babb to detain appellant. Officer Babb asked appellant and his sister to sit down in her work area. Approximately 30 to 45 minutes later, a Lieutenant Wagner arrived and took appellant to the city jail.
 {¶ 4} Detective James Gajowski testified that he was assigned to investigate a death at 3938 East 189th Street at approximately 10:20 a.m. on December 7, 2002. When he arrived at the scene at approximately 10:45 a.m., other officers directed him to a bedroom where he found the body of a deceased female. He observed that she was frothing from the mouth, and that her legs and neck were discolored. He also observed some scratches below the chin. He said the death appeared suspicious because of the marks on the victim's neck.
 {¶ 5} Gajowski was notified that appellant was at the Justice Center, so he and his partner proceeded there. They located appellant at the city jail at around 12:00 noon, and took him to the homicide unit of the Cleveland Police Department, where they informed him that they were investigating the death of the woman, whom they had identified as Beverly Atterberry. Appellant indicated that he would speak with them. Detective Gajowski's partner, Detective Cipo, read appellant his Miranda rights. Appellant appeared sober and oriented as to time, place and person.
 {¶ 6} Appellant gave a statement beginning at 1:00 p.m. Before he gave the statement, appellant affirmed, in writing, that he understood a written confirmation of his rights and that he wanted to make a statement. The statement was completed at 1:35 p.m., and appellant was asked to sign it. "He stated that he didn't feel comfortable signing it until he talked to his family or an attorney." The interview then ended.
 {¶ 7} Detective Gajowski sought appellant's consent to a search of the house at approximately 9:00 a.m. on December 10, 2002. Appellant provided his written consent to a search. Detective Gajowski and his partner reminded appellant of the statement he had given, and informed him that the coroner had ruled the death a homicide. Appellant confirmed that the statement was true and signed it after the police detectives read it to him. He told the police officers that he had not spoken to an attorney but had spoken to his family, who told him to cooperate.
 {¶ 8} At the conclusion of the hearing, the court denied both the motion to suppress and the motion for appointment of an expert. The case then proceeded to a jury trial.
 {¶ 9} At trial, Dr. Elizabeth Balraj, the Cuyahoga County coroner, testified that she autopsied the body of Beverly Atterberry on Sunday December 8, 2002. She observed extensive, recent bruising, scrapes and cuts on the body. There were surgical dressings on both arms and the right leg. There was extensive hemorrhaging of the soft tissues of the neck. The hyoid bone was fractured, an injury only sustained by squeezing the neck. She found extensive hemorrhaging in the soft tissues of the victim's body, and estimated that the victim had bled two liters or more into her soft tissues. The coroner testified that a person of the victim's size would have blood volume of approximately six liters, and if a person lost a third of his or her blood volume (as the victim did here), he or she could go into shock and die. She testified that the cause of death here was multiple blunt impacts and massive soft tissue hemorrhaging.
 {¶ 10} Toxicology found no alcohol, but did find cocaine metabolites in the victim's blood, which the coroner described as "breakdown products" of cocaine. She explained that breakdown products do not have any adverse effect but are part of the process of eliminating cocaine from the body. She also found amitriptyline, also known as Ellavil, a prescription anti-anxiety drug, in the victim's blood. Over appellant's objection, the coroner testified that the victim's injuries were consistent with having been beaten to death, and that this was "one of the worst" cases of an adult death resulting from blunt impact injuries.
 {¶ 11} On cross-examination, the coroner testified that she had not been aware that the victim was foaming at the mouth when found, but that fact was not diagnostic of any one condition. She further testified that amitriptyline could be fatal at levels of three milligrams per liter; the level in the victim's blood was far lower than that, .64 milligrams per liter.
 {¶ 12} The victim's mother, Annie Atterberry, testified that the victim had known the defendant ever since she was a child. They had a boyfriend/girlfriend relationship for the past eleven years, and lived together at times. She described their relationship as "brutal." She testified that the victim had been living with her for most of 2002, but lived with the appellant from November 15, 2002 until her death.
 {¶ 13} Ms. Atterberry testified that on December 7, 2002 at approximately 10:00 a.m., she received a telephone call from "Potts," appellant's cousin, regarding her daughter. As a result of this call, Ms. Atterberry had her stepson, Frank, call the police. She and her stepson then drove to appellant's house. The police were already there. She was not allowed in the house and did not see her daughter, but the police told her that her daughter was dead.
 {¶ 14} Patrol Officer Richard Toussing testified that he responded to a call to check on the well-being of a person at 3938 East 189th Street. They found the house locked, and heard a dog inside, so the kennel was called. They broke into the house and found the victim lying in bed with the covers pulled up to her neck. She was motionless, and foam was coming from her mouth. His partner determined that she had no pulse.
 {¶ 15} Detective Gajowski testified about his investigation of the scene where the victim was found, and about the statement he and Detective Cipo took from appellant. He then read appellant's statement into the record. The statement reported that appellant and the victim had been fighting since the previous Tuesday, shouting and hitting each other. They were also drinking liquor and smoking crack. They both went to bed at 10:00 or 11:00 p.m., the victim in the bedroom and appellant on a couch. Appellant called out for the victim at around 3:00 a.m., and when she did not respond, he went into the bedroom and found that she was dead. He called his aunt and asked for her help. Instead, his sister picked him up and brought him to the police station. He denied that he and the victim had been physically fighting the day before. He stated that he felt responsible for her death because he fought with her, but he did not intend to kill her.
 {¶ 16} Patrol Officer Babb testified about the report appellant made to her, including his statement that "he had beat her [the victim] up pretty bad."
 {¶ 17} The jury was instructed on both murder and the lesser included offense of reckless homicide with respect to count one, but was only instructed on murder with respect to count two. It returned a verdict of not guilty of murder but guilty of reckless homicide with respect to count one, and guilty of murder with respect to count two. The court then sentenced appellant to 15 years to life imprisonment.
 Law and Analysis Motion to Suppress {¶ 18} In his first assignment of error, appellant argues that the court erred by overruling his motion to suppress the statement he made to the police. First, he claims the statement was taken in violation of his right to counsel. We disagree. Detective Gajowski testified that appellant was given hisMiranda warnings before he gave his statement. These warnings included notification that appellant had the right to have an attorney present and that if he could not afford an attorney, one would be appointed to represent him. He stated that he understood these rights and chose to proceed to make the statement. Thus, appellant's statement was not taken in violation of his right to counsel.
 {¶ 19} Appellant stated that he would not sign the statement until he had spoken to his family or an attorney. The fact that appellant asked to speak to his family or an attorney after he gave the statement but before he signed it does not affect its admissibility; his signature was not necessary to make the statement admissible. Moreover, appellant did not say that he wanted to have an attorney present for any further questioning. He only indicated that he wanted to speak with his family or an attorney before he signed. He spoke with his family and then agreed to sign the statement. Therefore, we agree with the common pleas court that the statement was not taken in violation of appellant's right to counsel. See Davis v. United States
(1994), 512 U.S. 452, 462 ("Unless the suspect actually requests an attorney, questioning may continue").
 {¶ 20} Appellant next argues that his statement was taken in violation of his Fourth Amendment right not to be held without a probable cause determination. Because he was arrested without a warrant, a judicial determination of probable cause was required promptly after his arrest. Gerstein v. Pugh (1975),420 U.S. 103, 125. A probable cause determination is presumptively prompt if it occurs within 48 hours of arrest. The defendant bears the burden showing that a hearing held within this period was nevertheless unreasonably delayed. Riverside County v.McLaughlin (1991), 500 U.S. 44, 56. On the other hand, if the probable cause determination does not occur within 48 hours after the arrest, the government bears the burden of demonstrating that an extraordinary circumstance precluded an earlier determination. Id. at 57.
 {¶ 21} Appellant contends that suppression of evidence obtained incident to his arrest, including his statement, is the proper remedy for the state's failure to obtain a prompt probable cause determination. Notably, appellant does not argue that there was no probable cause for his arrest. He only argues that the state failed to obtain a prompt probable cause determination. Cf.Dunaway v. New York (1979), 442 U.S. 200. Consequently, we presume that the appellant's detention was lawful at the time he gave the statement. Suppression of this statement is not an appropriate remedy for a constitutional violation which allegedly occurred after the statement was made. United States v.Fullerton (6th Cir. 1999), 187 F.3d 587. Therefore, even if there was a McLaughlin violation, we would not suppress this statement as a result.
 {¶ 22} Appellant contends that he was not given fullMiranda warnings. The record belies this contention. In addition to the written statement of rights which appellant acknowledged, Officer Gajowski testified that Officer Cipo orally advised appellant of his constitutional rights, including his right to remain silent, his right to have an attorney present during questioning, and his right to have an attorney appointed to represent him free of charge. Therefore, we reject this argument.
 {¶ 23} Finally, appellant urges that his statement was involuntary because he was held for several days without a probable cause determination. However, as noted above, the statement was obtained at the beginning of his detention. Therefore, the length of his detention does not demonstrate that the statement was involuntarily obtained.
 {¶ 24} Accordingly, we overrule the first assignment of error.
 Appointment of Medical Expert {¶ 25} In his second assigned error, appellant asserts that the court erred by denying his motion for appointment of a medical expert. There is no statutory authority mandating the appointment of expert witnesses to assist indigent defendants in non-capital cases. State v. Weeks (1989), 64 Ohio App.3d 595,598. Thus, the standard to be applied is abuse of discretion. Id. We use as a guide the factors that are used in determining whether to appoint an expert in capital cases under R.C.2929.024. State v. Weeks (1989), 64 Ohio App.3d 595, 598;State v. Scott (1987), 41 Ohio App.3d 313, 315. Under R.C.2929.024, the court may authorize the defendant's counsel to obtain expert services if the court finds that the services are reasonably necessary. In determining whether the services are reasonably necessary, the factors the trial court should consider are (1) the value of the expert assistance to the proper representation of the defendant, and (2) the availability of alternative means to fulfill the same function as the expert assistance which is sought. State v. Jenkins (1984),15 Ohio St.3d 164, 193.
 {¶ 26} Although appellant claims there was an issue as to the cause of the victim's death, appellant questioned the coroner on all of the issues he raises now, and the coroner rejected them all. Dr. Balraj testified that the levels of amitriptyline in the victim's blood were not sufficient to have caused her death. There were harmless cocaine metabolites in her blood, but there was no cocaine in the victim's system at the time of her death, so neither cocaine use nor the interaction of cocaine and amitriptyline could have caused her death. The frothing or foaming from the mouth was not diagnostic. Therefore, appellant has failed to demonstrate that an expert witness would have provided any services of value to his defense, or achieved any result which was not achieved through cross-examination of the coroner. The second assigned error is overruled.
 Allegedly Prejudicial and Inflammatory Evidence {¶ 27} Next, appellant asserts that the court erred by allowing prejudicial and inflammatory testimony at trial. First, he complains that the prosecutor was allowed to ask the coroner whether the victim was beaten to death, and whether her injuries were consistent with having been beaten to death. This testimony was not inflammatory but was necessary to link the victim's death from multiple blunt force trauma to appellant's admitted actions in hitting her repeatedly over the previous three days.
 {¶ 28} Appellant also argues that he was prejudiced by the testimony of the victim's mother that the relationship between appellant and the victim was "[b]rutal; she [the victim] was always beaten up." The prosecutor's question — "How would you characterize the relationship that your daughter had with [appellant]? — did not invite this response, so we cannot characterize this as an instance of prosecutorial misconduct. The court did not have an opportunity to rule on appellant's objection to this question before the witness answered. Appellant did not request a mistrial or a corrective instruction, which could have repaired any prejudice. We cannot say that this one statement, in itself, denied appellant a fair trial. Therefore, we overrule the third assignment of error.
 Admission of Written Statement {¶ 29} Appellant urges that the court erred by allowing the state to both introduce his written statement and read the statement to the jury. He contends this was cumulative and gave undue emphasis to his statement. "A trial court enjoys broad discretion in admitting evidence. This court will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice."State v. Long (1978), 53 Ohio St.2d 91, 98. Abuse of discretion connotes an attitude which is unreasonable, arbitrary or unconscionable. "Upon review, we cannot say that this is an instance where the trial court abused its discretion and acted unreasonably or arbitrarily by admitting Defendant's written statement into evidence thus causing the needless presentation of cumulative evidence." State v. Overholt, Medina App. No. 02CA0108-M, 2003-Ohio-3500, ¶ 43. Therefore, we overrule the fourth assignment of error.
 Allegedly Improper Argument {¶ 30} Appellant next contends that the prosecutor improperly expressed his personal opinion about the defendant's guilt when he stated, in closing argument, "So he's clearly guilty of count two." Reviewing the statement in context, we cannot characterize this argument as an expression of personal opinion. The prosecutor argued:
 {¶ 31} "Now, you have two counts in front of you. And each count is a separate and distinct matter.
 {¶ 32} "Count two is a no brainer. It says, caused the death of another, as a proximate result of committing felonious assault. Felonious assault is knowingly causing serious physical harm to another.
 {¶ 33} "This lady is riddled with serious physical harm.
 {¶ 34} "* * *
 {¶ 35} "This woman did not fall down a flight of steps. This woman was not run over by a car. This woman did not inflict these injuries upon herself. She was beaten, over, and over, and over, and over, and over, and over, and over again.
 {¶ 36} "She was beaten to death.
 {¶ 37} "Now, to cause the death of another as a proximate result of committing felonious assault. That's a no brainer, ladies and gentlemen. I mean, with all due respect, that's not even arguable —
 {¶ 38} "MR. P. MANCINO [defense counsel]: Objection.
 {¶ 39} "MR. BOMBIK [prosecutor]: — under the evidence of this case.
 {¶ 40} "THE COURT: This is argument. Overruled.
 {¶ 41} "MR. BOMBIK: Well, it isn't.
 {¶ 42} "So he's clearly guilty of count two."
 {¶ 43} "MR. P. MANCINO: Objection.
 {¶ 44} "THE COURT: Well, it's going to be a jury question, but we're in the argument right now. Overruled."
 {¶ 45} This argument simply cannot be characterized as an expression of the prosecutor's personal opinion. Viewed as a whole, it was an argument that the evidence demonstrated appellant's guilt. In any case, the court corrected any misconceptions the jury may have had by stating that the defendant's guilt was a jury question. Therefore, the fifth assignment of error is overruled.
 Jury Instructions {¶ 46} Appellant's sixth assignment of error claims that the court erred by refusing to include a jury instruction on reckless homicide in connection with the second count of murder, although the court included such an instruction in connection with the first murder charge. He asserts that it was somehow "unfair" not to include an instruction on the lesser offense under both counts.
 {¶ 47} We agree with appellant that reckless homicide may be a lesser included offense of the form of murder charged in count two of the indictment, that is, causing the death of another as a proximate result of committing an offense of violence which is a first or second degree felony. State v. Jones, Cuyahoga App. No. 80737, 2002-Ohio-6045, ¶ 94. However, an instruction on a lesser included offense is warranted only if the jury could reasonably conclude that the evidence supported the lesser charge and did not support the greater charge. State v. Kidder (1987),32 Ohio St.3d 279. The evidence in the record showed that appellant struck the victim repeatedly over several days causing extensive bruising and hemorrhaging, and she died as a result those injuries. "[T]he jury could not have reasonably concluded that the evidence presented in this case supports a conviction for reckless homicide but not murder under R.C. 2903.02(B)."Jones, ¶ 94. Therefore, we overrule the sixth assignment of error.[1]
 {¶ 48} Appellant's seventh assignment of error complains that the court instructed the jury in such a way as to allow him to be convicted for the intervening act of another. We do not agree that this was the import of the court's instruction. The court's instruction stated that the defendant was responsible for the consequences of his own unlawful act or failure to act, even if harm was also caused by others. In any case, there was no evidence of intervening acts which may have caused the victim's death. Therefore, appellant could not have been prejudiced by this instruction.
 Motion for Acquittal {¶ 49} Appellant next asserts that the court erred by denying his motion for judgment of acquittal. Appellant asserts that the coroner's testimony was equivocal as to the cause of death. Again, we must disagree. The coroner testified that the victim died as a result of multiple blunt impacts to the head, neck, upper and lower extremities, and massive soft tissue hemorrhage. She specifically denied that the cocaine metabolites and amitriptyline in the victim's blood contributed to her death. She further denied that the frothing from the victim's mouth was diagnostic of any one condition. Her testimony, taken together with appellant's own statement that he had beaten the victim "pretty bad," amply supported the conclusion that appellant caused the victim's death. Therefore, we overrule the eighth assignment of error.
 Allegedly Inconsistent Verdicts {¶ 50} Appellant contends that the two guilty verdicts were inconsistent. To the contrary, the verdicts were entirely consistent. The jury found that appellant "recklessly" caused the victim's death, in violation of R.C., 2903.041, and that he caused her death as a proximate result of a first or second degree felony offense of violence, in violation of R.C.2903.02(B). R.C. 2903.02(B) does not prescribe a culpable mental state in causing the death of another for purposes of the offense of murder.[2] Therefore, the jury's determination that appellant recklessly caused the victim's death is not inconsistent with the finding that he committed a felony offense of violence, as a proximate result of which he caused the victim's death. Accordingly, we overrule the ninth assignment of error.
 Sentencing {¶ 51} Appellant argues that the court erred by sentencing him for murder rather than for reckless homicide. We are not aware of any authority which requires that appellant may be convicted only of the lesser of two allied offenses of similar import. Accordingly, we overrule the tenth assignment of error.
 Constitutionality of R.C. 2903.02(B) {¶ 52} Finally, appellant contends that the offense of murder of which he was convicted was functionally equivalent to involuntary manslaughter, a lesser offense. He argues the Revised Code therefore imposes disparate penalties for the same offense, in violation of his rights to equal protection and due process. We previously rejected these arguments in Jones, at ¶¶ 125-136. Accordingly, we overrule the eleventh assignment of error, and affirm the common pleas court's decision.
Judgment affirmed.
Patricia ann Blackmon, P.J., and Sweeney, J., concur.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc. App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).
#83138 State of Ohio v. Dan Day.
[1] This conclusion does not undermine the jury's finding that appellant was guilty of reckless homicide under count one of the indictment. The elements of murder under counts one and two were distinct. The jury could consistently find that appellant did not purposely cause the victim's death, but that he did recklessly cause her death, and that appellant caused the victim's death as a proximate result of committing an offense of violence which was a first or second degree felony. There was simply no evidence from which the jury could have concluded that appellant recklessly caused the victim's death by some means other than a first or second degree felony of violence.
[2] This does not mean that the state is relieved of the obligation of proving mens rea under R.C. 2903.02(B). Under the common law approach to felony murder, intent to kill is presumed from the intent to commit the underlying felony. Jones, at ¶ 130. Alternatively, this court has previously noted that, where a statute does not include a culpable mental state and does not plainly indicate an intent to impose strict liability, the applicable culpable mental state is recklessness. Jones, at ¶ 77; R.C. 2901.21(B).